WESTERN MASSACHUSETTS
ELECTRIC COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Pittsfield Generating Company, L.P.,
and Masspower, Intervenors.

Nos. 92–1665, 94–1290 and 97–1726.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 2, 1998.

Decided Jan. 15, 1999.

David B. Raskin argued the cause for petitioner. With him on the briefs was Frederic Lee Klein.

Samuel Soopper, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor. Edward S. Geldermann, Attorney, entered an appearance.

Before: HENDERSON, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Western Massachusetts Electric Company—WMECO—petitions for review of six orders of the Federal Energy Regulatory Commission asserting jurisdiction over certain interconnection agreements and ordering the cost of grid upgrades associated with the interconnections to be rolled into WMECO's rate base rather than be borne exclusively by the interconnecting facilities. For the reasons that follow, we deny the petitions for review.

I

***The Altresco Agreements***

Altresco–Pittsfield Limited Partnership[1] operates a 165 MW cogeneration plant located adjacent to a General Electric facility in Pittsfield, Massachusetts. In 1988, the Altresco plant was certified as a "qualifying facility" under the Public Utility Regulatory Policies Act of 1978 (PURPA). *See* 16 U.S.C. §§ 824a–3(j) and 796(17) & (18). Altresco's certification as a qualifying facility allows it to compel electric utilities to purchase the power it generates and to require interconnection with those purchasing utilities in order to facilitate such sales. *See* 18 C.F.R. § 292.303(a) & (c).

Beginning in 1989, Altresco entered into a series of contracts with WMECO under which Altresco would interconnect with WMECO's transmission grid. The purpose of the interconnection was to enable WMECO to transmit Altresco-generated power across its grid to the New England Power Company (NEPCO); WMECO would not itself purchase any of Altresco's output. The agreements set out the terms and conditions under which WMECO was to construct, operate, and maintain the interconnection. The interconnection itself was to be accomplished by means of a radial line from Altresco's generating facility to a point on WMECO's grid. According to studies performed by WMECO, the Altresco interconnection required certain lines and substations on the grid to be upgraded in order to preserve the grid's reliability. Altresco was to bear the $3.9 million[2] cost of the interconnection, including the cost of the upgrades to WMECO's grid.

Believing that the Altresco interconnection agreements would be subject to state rather than federal regulatory authority, WMECO filed the agreements with the Massachusetts Department of Public Utilities rather than with the Commission. In 1989 and 1990, WMECO negotiated transmission service agreements with NEPCO under which WMECO would wheel Altresco-generated power to NEPCO. These transmission agreements were filed with the Commission. The Commission responded on April 24, 1992, with an order setting the transmission rates for hearing and also asserting jurisdiction over the interconnection agreements themselves. *See Western Massachusetts Elec. Co.*, 59 F.E.R.C. ¶ 61,091, at 61,343 (1992).

WMECO requested a rehearing on the question of the Commission's jurisdiction over the interconnection agreements, arguing that PURPA gives state authorities jurisdiction over interconnections between utilities and qualifying facilities. It further argued that the agreements did not fall within the Commission's jurisdiction because they involved facilities rather than services, because they were all preoperational, and because they did not involve the interstate transmission of power.

In a November 1992 order, the Commission rejected WMECO's arguments and denied its request for rehearing on the question of jurisdiction. *See Western Massachusetts Elec. Co.*, 61 F.E.R.C. ¶ 61,182 (1992). The Commission relied on § 205(c) of the Federal Power Act, 16 U.S.C. § 824d(c), and on 18

1. Altresco–Pittsfield is now known as Pittsfield Generating Company, L.P. For the sake of consistency with the Commission's orders in this case, we will continue to refer to it as Altresco.

2. This figure includes $2.98 million for grid upgrades, $510,000 for the radial line connecting Altresco to the WMECO grid, and $450,000 for feasibility and engineering studies.

C.F.R. § 292.303, the regulation setting out the obligation to interconnect. Section 205(c) provides for Commission jurisdiction over "all contracts which in any manner affect or relate to [transmission] rates, charges, classifications, and services, [which are subject to the jurisdiction of the Commission]." 16 U.S.C. § 824d(c). The agreements "relate to" transmission rates, the Commission held, because the purpose of the interconnection was to facilitate transmission of Altresco-generated power to NEPCO. Therefore the agreements fell within the Commission's jurisdiction under § 205(c).

The Commission also held that the regulation assigning jurisdiction over interconnections to state authorities did not apply in this case because WMECO had no obligation to interconnect under § 292.303. WMECO was providing only transmission service; it was not purchasing any of Altresco's output. As the Commission saw it, § 292.303 does not extend the obligation to interconnect "to utilities located between the buyer and the seller that provide transmission service." 61 F.E.R.C. at 61,662. When there is no obligation to interconnect, the regulation providing for state regulatory authority over interconnections, 18 C.F.R. § 292.306(a), does not apply. The Commission concluded, therefore, that these agreements were fully within its jurisdiction.

The Commission's orders of April and November 1992 asserting jurisdiction and denying rehearing are the subject of WMECO's December 1992 petition for review in this Court, No. 92–1665.

The Commission ordered an evidentiary hearing before an administrative law judge to determine the "justness and reasonableness" of assigning to Altresco all costs associated with the interconnection agreements. *Western Massachusetts Elec. Co.*, 63 F.E.R.C. ¶ 61,039, at 61,197 (1993). In the hearing, WMECO argued that the entire cost, including the cost of the grid upgrades, was directly related to the interconnection and therefore could properly be assigned to Altresco. The Commission staff countered that only the $510,000 cost of the radial line from Altresco's plant to the WMECO grid was assignable to the interconnection itself. The

remaining amount, in the staff's view, should be allocated to system upgrades, upgrades that should be rolled into the rate base and recovered from all WMECO customers.

The ALJ ruled that the statute did not support the Commission's interpretation of what constitutes interconnection costs. *See Western Massachusetts Elec. Co.*, 64 F.E.R.C. ¶ 63,028, at 65,127 (1993). According to the ALJ, nothing in PURPA or in the Commission's regulations implementing PURPA limits interconnection costs to the cost of radial lines. Because the local grid upgrades were directly related to the interconnection, the ALJ concluded that it was just and reasonable for WMECO to assign to Altresco the entire cost incurred under the interconnection agreements, including the cost of the grid upgrades.

In a December 1996 order, the Commission reversed the ALJ's initial decision with regard to the cost of the grid upgrades. It agreed with the testimony of staff witness Tekumalla that the upgrades provided a system-wide benefit and concluded that, because "the cost of the reinforcements must be treated as grid-related costs rather than as interconnection costs," it was proper for WMECO to recover the cost of the upgrades from all customers on the grid through rolled-in rates. *See Western Massachusetts Elec. Co.*, 77 F.E.R.C. ¶ 61,268, at 62,120 (1996). The Commission denied a request for rehearing. *See Western Massachusetts Elec. Co.*, 81 F.E.R.C. ¶ 61,152, at 61,692 (1997). The orders reversing the ALJ and denying rehearing are the subject of WMECO's December 1997 petition for review, No. 97–1726.

### The Masspower Agreements

Masspower owns a natural-gas-fired cogeneration plant in Springfield, Massachusetts. The plant is a qualifying facility under PURPA. In 1991, WMECO agreed to interconnect Masspower's plant with the WMECO transmission grid. The interconnection was intended to allow WMECO to purchase a portion of Masspower's output and to wheel the rest of it across its transmission grid to other purchasers. As with the Altresco agreements, the Masspower agreements in-

cluded upgrades to the transmission grid and required the qualifying facility to bear all the costs associated with the interconnection, including the cost of the upgrades. Because, in the Altresco proceedings, the Commission had already asserted jurisdiction over agreements similarly involving the transmission of qualifying-facility energy to other producers, WMECO filed the Masspower agreements and proposed transmission rates with the Commission, rather than with the state regulatory authority.

In support of its cost assignment to Masspower, WMECO argued that the grid upgrades were necessitated by the interconnection and that they were actually less expensive than a radial line would have been. The agreements assigned all interconnection and grid reinforcement costs to Masspower, and the proposed transmission rates included additional charges for customers receiving Masspower energy. Such a plan, the Commission held, would result in the over-collection of costs, contrary to the Commission's transmission pricing guidelines. Accordingly, the Commission ordered WMECO to file revised charges assigning the costs of the interconnection—but not of the grid upgrades—to Masspower. The Commission denied WMECO's request for rehearing in February 1994. *See Western Massachusetts Elec. Co.,* 66 F.E.R.C. ¶ 61,167 (1994). The order to file revised charges and the order denying rehearing are the subject of WMECO's April 1994 petition for review, No. 94–1290.

## II

The consolidated petitions present two central questions. The first is whether the Commission's assertion of jurisdiction over the Altresco and Masspower interconnection agreements was "inconsistent with the regulation" or was a "plainly erroneous" interpre-

tation of the Commission's regulations.[3] *See Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997) (citing *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). The second is whether the Commission properly determined that WMECO may not assign the cost of the grid upgrades to the qualifying facilities.

## A

■ As to the jurisdictional question, three regulatory provisions must be considered: the provision governing a utility's obligation to purchase power from a qualifying facility; the provision governing indirect purchases from a qualifying facility; and the provision governing a utility's obligation to interconnect with a qualifying facility.

The purchase obligation, as contained in § 292.303(a), states that "Each electric utility shall purchase . . . any energy and capacity which is made available from a qualifying facility: (1) Directly to the electric utility; or (2) Indirectly to the electric utility in accordance with paragraph (d) of this section." 18 C.F.R. § 292.303(a).

Paragraph (d) of § 292.303 governs indirect purchases from a qualifying facility. It states:

> If a qualifying facility agrees, an electric utility which would otherwise be obligated to purchase energy or capacity from such qualifying facility may transmit the energy or capacity to any other electric utility. Any electric utility to which such energy or capacity is transmitted shall purchase such

---

**3.** WMECO challenges not only the Commission's jurisdiction over the Altresco agreements, but also its jurisdiction over the Masspower agreements. Although WMECO "reserve[d] its rights to contest jurisdiction as may be necessary and appropriate," the orders in the Masspower proceedings do not indicate that the company actually contested the Commission's jurisdiction. *See, e.g., Western Massachusetts Elec. Co.,* 63 F.E.R.C. ¶ 61,222, at 62,612 n. 4 (1993); *Western*

*Massachusetts Elec. Co.,* 66 F.E.R.C. ¶ 61,167, at 61,333 (1994). Whether WMECO thereby waived the jurisdictional argument is, however, unnecessary to decide. Because the interconnections facilitate WMECO's wheeling of qualifying-facility output, the analysis is the same for the Altresco and the Masspower agreements. If the Commission had jurisdiction over the Altresco agreements, it also had jurisdiction over the Masspower agreements.

energy or capacity under this subpart as if the qualifying facility were supplying energy or capacity directly to such electric utility. . . .

18 C.F.R. § 292.303(d).

The obligation to interconnect is contained in paragraph (c) of § 292.303. This critical provision states: "[A]ny electric utility shall make such interconnections with any qualifying facility *as may be necessary to accomplish purchases or sales under this subpart.*" 18 C.F.R. § 292.303(c) (emphasis added).

WMECO contends that the Commission ignored the full significance of the italicized language in paragraph (c) when it asserted jurisdiction over the Altresco agreements. According to WMECO, the obligation to interconnect applies to all "purchases or sales under this subpart," which includes indirect sales under paragraph (d)—that is, situations in which the interconnecting utility only provides transmission service and does not purchase any of the qualifying facility's output. Thus, it concludes, the Altresco and Masspower interconnections should be subject to state, rather than federal, regulatory jurisdiction, even though they involve transmission, rather than purchase, by the interconnecting utility.

■ Whatever force one may ascribe to WMECO's reading, it has not shown the Commission's interpretation to be "plainly erroneous" or "inconsistent with the regulations." *Auer,* 117 S.Ct. at 911. In "a competition between possible meanings of a regulation, the agency's choice receives substantial deference" so long as it is "logically consistent with the language of the regulation" and "serves a permissible regulatory purpose." *Rollins Envtl. Servs. (NJ), Inc. v. EPA,* 937 F.2d 649, 652 (D.C.Cir.1991). The Commission read the interconnection obligation in § 292.303(c)(1) to be contingent on the obligation to purchase in § 292.303(a). The obligation to interconnect applies to any electric utility that is *purchasing* all of the output of a qualifying facility. It does not apply, the Commission believed, when that utility transmits the energy to another utility. WMECO is not purchasing energy from Altresco, and although it is purchasing some of Masspower's output, it is transmitting the remainder

of that output to other purchasers. The Commission reads § 292.303(c) as if it read "any electric utility shall make such interconnections with any qualifying facility as may be necessary to accomplish purchases or sales [*to it*] under this subpart." The "to it" is inferred, but properly so, and the Commission's explanation offered when it promulgated the regulation demonstrates why.

The statute—PURPA—did not by its terms impose upon electric utilities an obligation to interconnect with qualifying facilities; the explicit obligation imposed by statute was to purchase their output. *See* 16 U.S.C. § 824a–3(a). When the Commission promulgated regulations to implement PURPA, it derived an obligation to interconnect. Without an interconnection obligation, the Commission reasoned, a qualifying facility seeking to interconnect with an unwilling utility would have to obtain an interconnection order from the Commission, after going through the potentially time-consuming and costly hearing procedures of § 210 of the Federal Power Act. *See* 16 U.S.C. § 824i. The Commission designed § 292.303(c) to avoid this problem and thereby reduce the burden on small power producers. *See Small Power Prod. & Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978,* Order No. 69, F.E.R.C. Stats. & Regs. (CCH Transfer Binder, Regulations Preambles 1977–1981) ¶ 30,128, at 30,873 (1980) ("Order No. 69"). In its order denying rehearing here, the Commission made note of this history. *See* 61 F.E.R.C. at 61,662 n. 17 (citing Order No. 69, at 30,873). It is therefore not plainly erroneous or inconsistent with the regulation to infer that § 292.303(c)(1) applies only to purchasing utilities, as § 292.303(a) clearly does. The Commission had a solid basis for its interpretation of the regulations. The Commission's reading of § 292.303(c) is also consistent with § 205 of the Federal Power Act. It places the charges for transmission under the Commission's jurisdiction, rather than under the jurisdiction of the state agency. The Commission also made this clear when it promulgated § 292.303(d) in 1980. *See* Order No. 69, at 30,872.

WMECO asserts that none of the Altresco agreements provides for the transmission of energy, that they are all preoperational, and that this defeats the Commission's jurisdiction under § 205(c) of the Federal Power Act. The argument fails to account for the language of § 205(c), which gives the Commission jurisdiction over any contract that "relates to" rates and charges for the transmission of electric energy—as the Altresco and Masspower agreements surely do. Nor do the Commission orders WMECO cites— *Coso Energy Developers,* 48 F.E.R.C. ¶ 61,-044, at 61,213 (1989), and *Gamma Mariah, Inc.,* 44 F.E.R.C. ¶ 61,442, at 62,399 (1988)— provide any support for its reading of § 205(c). In both of those proceedings, the Commission declined to assert jurisdiction because the agreements involved the inclusion of transmission facilities as part of the qualifying facilities themselves, rather than as part of the interconnecting public utilities. *See* 61 F.E.R.C. at 61,664. Those orders therefore do not control the Commission's jurisdiction over the Altresco and Masspower agreements, in which the disputed line upgrades will be part of WMECO's grid. *Cf. American Municipal Power–Ohio, Inc.,* 57 F.E.R.C. ¶ 61,358, at 62,161 (1991).

### B

■ The second question is whether the Commission properly required WMECO to roll the cost of the Altresco and Masspower grid upgrades into its transmission rates.

With regard to the Altresco agreements, the Commission accepted the position of staff witness Tekumalla, who testified that any enhancement of an integrated grid system— such as the upgrades at issue here—performs a system-wide function and provides benefits to all customers on the grid. Having considered all the upgrades planned by WMECO and having performed a loadflow analysis, Tekumalla provided at least three reasons why the upgrades would provide a benefit to all users of the transmission grid and not just Altresco. First, the physical configuration of the upgrades makes it clear that their purpose is not merely to provide a power path from the Altresco facility to the WMECO grid—which would benefit Altresco alone—but to enhance a system used by many customers. Second, the loadflow over the upgraded grid facilities will not remain constant. When the flow from Altresco is lower than expected, then other grid customers will be making use of the upgraded grid facilities. Third, it cannot be determined for sure that the upgrades would merely restore the transfer capability of the WMECO grid to the precise level that existed prior to the Altresco interconnection. In addition, Tekumalla considered the testimony of WMECO's engineer and concluded that the engineer's position that only Altresco would benefit from the upgrades relied upon a level of precision in planning that would have been difficult to achieve, given the variability of loadflow conditions and modeling techniques.

One element of reasoned decisionmaking is a demonstrable link between the facts found and the choice. *See Public Service Comm'n of New York v. FERC,* 813 F.2d 448, 451 (D.C.Cir.1987). Tekumalla's testimony provides the link. Tekumalla's characterization of the upgrades was based on identifying the beneficiary of the upgrades. The facts he cited demonstrate that customers other than Altresco will make use of and benefit from the grid upgrades. The choice made by the Commission links up with those facts because it requires the beneficiaries of the upgrades to bear the costs.

■ The Commission's position with regard to assignment of costs is, so far as we can tell, part of a consistent policy to assign the costs of system-wide benefits to all customers on an integrated transmission grid. We have approved the underlying rationale of this policy. When a system is integrated, any system enhancements are presumed to benefit the entire system. *See, e.g., Maine Pub. Serv. Co. v. FERC,* 964 F.2d 5, 8–9 (D.C.Cir.1992); *City of Holyoke Gas & Elec. Dep't v. FERC,* 954 F.2d 740, 742–43 (D.C.Cir.1992). Before the Commission, WMECO did not dispute the fact that its transmission grid was integrated. Rather, it attempted to demonstrate why the grid upgrades provided no benefit to any customer except Altresco. The Commission instead accepted staff witness Tekumalla's testimony. As we have said, he testified that WMECO's

assumptions about the allocation of benefits required a level of precision in planning that would be difficult to achieve. The Commission's presumption of a system-wide benefit was, in short, based on substantial evidence.

WMECO argues that the Commission failed to consider the cost-shifting effects of its order to roll in costs of the system upgrades. It claims that requiring all grid customers to bear the cost of the upgrades unfairly shifts costs properly borne by the qualifying facility—which in turn will reap a windfall as a result. It also claims that the Commission's decision creates perverse incentives for qualifying facilities to ignore economic efficiency in locating their plants because they know that the grid customers will foot the bill.

■ The Commission did consider the potential for cost shifting, however, and found it not to be present in this case. As this court has often noted, "we are obliged to defer to [the Commission's] technical ratemaking expertise so long as it has supplied sufficient reasoning backed up by substantial evidence." *Pennsylvania Elec. Co. v. FERC,* 11 F.3d 207, 211 (D.C.Cir.1993) (quoting *Alabama Power Co. v. FERC,* 993 F.2d 1557, 1560 (D.C.Cir.1993)) (internal quotation marks omitted). We think that the Commission's rejection of WMECO's cost-shifting argument was adequately supported by logic and evidence. In any event, WMECO's arguments about cost-shifting and perverse incentives are mistaken. If a qualifying facility seeking interconnection for transmission purposes located its plant far from the utility's lines knowing that the interconnection costs would be spread among the utility's customers, the utility could simply refuse to transmit the power. Although the utility would still have an obligation to purchase the qualifying facility's output, *see* 18 C.F.R. § 292.303(a), the qualifying facility, rather than the utility's customers, would wind up paying for the interconnection. A qualifying facility could not afford to take that risk and therefore would do all it could to keep the costs of interconnection to a minimum. Of course, a cogenerator such as Altresco would not have much of a choice about where to locate its facility because cogenerators need to be near their hosts anyway.

As to the question of cost assignment in the Masspower case, we also view the Commission's order as reasonable. The Commission found that, in addition to assigning all interconnection costs to Masspower, WMECO also intended to charge grid customers an increased rate for transmitting Masspower's output. The Commission believed that such a cost-recovery scheme would have resulted in over-collection of costs, contrary to the Commission's transmission pricing guidelines. In its request for rehearing, WMECO raised the same objection to the Commission's order as it did in the Altresco proceeding: the grid upgrades do not benefit the entire system but only restore the grid's reliability to the status quo. The Commission was not persuaded to deviate from its current policy regarding integrated systems. *See Appalachian Power Co.,* 63 F.E.R.C. ¶ 61,151, at 61,978, *supplemental order,* 64 F.E.R.C. ¶ 61,327 (1993). In light of our holding with regard to the Altresco agreements, we cannot say that the Commission erred in applying its policy to the Masspower agreements.

For the foregoing reasons, the petitions for judicial review are denied.

*So ordered.*